## UNITED STATES *v.* BIWABIK MINING COMPANY.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 594.   Argued March 4, 5, 6, 1918.—Decided May 20, 1918.

In computing the excise, under the Corporation Tax Act of August 5, 1909, of a mining company operating under a lease terminable at its option in any year and which grants it the privilege of entering, and of exploring for, mining and removing ores, in return for a royalty of so much per ton removed, but which does not convey the ore *in situ*, that part of the value of the ore disposed of during the tax year which represents its value as ore in place when the law took effect should not be deducted as depreciation of capital assets. *Von Baumbach* v. *Sargent Land Co.*, 242 U. S. 503.

The lease here involved is not to be construed as a conveyance of the ore in place, although the latter could be measured with substantial accuracy.

242 Fed. Rep. 9, reversed.

THE case is stated in the opinion.

*The Solicitor General,* with whom *Mr. Wm. C. Herron* was on the brief, for the United States.

*Mr. A. C. Dustin* for respondent, besides dealing with the distinction to be drawn between income and a mere conversion of capital assets existent before the law took effect, presented the following on the nature of the company's interest:

It is said the Biwabik Mining Company's interest in this property was obtained under a lease and that as such lessee it was not the *owner* of the *ore,* and was not, therefore, when it sold the ore converting its capital assets into money.   Whether these contracts of lease effected an *absolute* sale of the ore or not is wholly immaterial.   It is

settled that they do create an interest in real estate of a permanent character which cannot be divested so long as the contract provisions are complied with.   Such a lease is recognized as property and is frequently sold and dealt in in the same way as other property.   In 1898 the defendant paid $612,000 for this lease, which was on January 1, 1909, of the agreed value of $3,351,413.81.   That a lessee of a mine has a vested estate is well settled.

The position of the Government is in effect that the interest is a mere license to take the ore on payment of the 30 cents per ton.   The distinction between such an estate as we have here and a mere license is well recognized.   Snyder on Mines, vol. II, §§ 1143, 1390, 1394, 1397; *Wheeler* v. *West*, 71 California, 126, 129; *Boone* v. *Stover*, 66 Missouri, 430, 434; *Barnsdall* v. *Gas Company*, 225 Pa. St. 338; *Coltness Iron Co.* v. *Black*, 6 App. Cas. 315, 335; *Stoughton's Appeal*, 88 Pa. St. 198, 201, 202; *Scranton* v. *Phillips*, 94 Pa. St. 15, 22; *Eley's Appeal*, 103 Pa. St. 300; *Delaware, Lackawanna & Western R. R. Co.* v. *Sanderson*, 109 Pa. St. 583.

The court below distinguishes this case from the *Sargent Land Company Case* in this court, pointing out that royalties could very properly be treated as simply rentals so far as the lessor is concerned; the use of the land for mining purposes being only one of the many uses to which such land could be put, the land itself being the chief thing. But these reasons do not apply to the case of a lessee whose interest is in the ore, which is susceptible of definite measurement and valuation.   This interest is wholly exhausted and consumed as the ore is extracted.

It should not be overlooked that after giving the Biwabik Company full credit for the value of its capital assets thus converted into money there was left a large net income in 1910 upon which it paid the taxes assessed by the Government.   The construction adopted by the court simply places the company on a parity with other

corporations. It gives it the benefit of the realization of its capital assets as they existed on January 1, 1909.

The action of Congress in allowing first five per cent. and later in full for the depletion of ores, when it came to replace the original corporation tax by the Acts of 1913 and 1916, successively, was an acceptance in principle of the interpretation placed upon the Act of 1909 by the Treasury Department, and reflexly shows what that act itself intended. All the income tax laws are part of a system and cast light one upon another.

The *Sargent Land Company Case*, and *Stratton's Independence* v. *Howbert*, 231 U. S. 399, and *Stanton* v. *Baltic Mining Co.*, 240 U. S. 103, are not in point.

*Mr. Robert R. Reed*, by leave of court, filed a brief on behalf of the Investment Bankers' Association of America, as *amicus curiæ*.

MR. JUSTICE DAY delivered the opinion of the court.

This case is here upon a writ of certiorari to the United States Circuit Court of Appeals for the Sixth Circuit. It was instituted by the United States in the District Court of the United States for the Northern District of Ohio to recover the sum of $2,653.72 being 1% upon $265,372.08 which, it was claimed, the mining company had wrongfully omitted from the return of its net income for the year 1910 under the Corporation Tax Act of 1909.

The case was tried upon an agreed statement of facts which, omitting unnecessary details, were epitomized by the District Court as follows:

"In the year 1898 the defendant, by assignment of a lease, acquired a leasehold estate in certain ore producing properties in the State of Minnesota, from which it mined ore from that date to and including the year 1910. For the year 1910 the defendant made a return to the collector

of internal revenue of its gross income, and from this amount it deducted, 'to cover realization of unearned increment,' the sum of $265,372.08. The amount of this deduction was arrived at by multiplying the number of tons of ore mined during the year by 48¾c., which was the market value of the ore in place on the premises on the first day of January, 1909, as estimated by the defendant, this being the date upon which the returns for taxation were to commence. It is stipulated that this deduction was made in good faith upon the claim that it was 'a reasonable allowance for depreciation' of the property of the defendant for that year.

"In June, 1911, payment was made in accordance with this return, but the Treasury Department about the month of October, 1914, after investigating the books and records of the defendant, made the claim that because the defendant was not the owner in fee of the premises from which it was mining ore, but was lessee of the same and was paying a royalty to the fee owners, it was not entitled to deduct anything for depletion of the ore body on the premises. Thereupon the defendant was requested to amend its return for the year 1910 so as to include in its gross income the amount of said deduction, which it declined to do, and thereupon this suit was instituted to recover the tax upon the amount of this deduction, amounting to $2,653.72.

"Some time prior to the making of the return for the year 1910 the defendant estimated the tonnage and the market value of the ore in place upon the premises upon which it held its lease, which estimate gave to the ore in place a value of 48¾c. per ton, exclusive of royalty.

"The rights of the defendant in the iron ore mined in the year 1910 were derived from the assignment to it of a written lease dated April 4, 1898, by the Biwabik Bessemer Company, lessor. By the terms of that lease the defendant acquired the right for the term of fifty years

and three months from the first day of May, 1898, to explore for, mine out, and remove the merchantable shipping iron ore which might be found upon the lands described in the lease upon the payment of a royalty of 30c. for each ton mined. The expression 'merchantable ore' is defined as including 'all ores which grade 55% and above in metallic iron regardless of other ingredients.'

"The lessee contracted to mine and remove at least 300,000 tons of ore annually, or to pay to the lessor 30c. per ton on that amount if it should not be mined, but payments made in any year in excess of royalty on ore actually mined could be credited upon the excess which might be mined over the minimum requirement in subsequent years. Any failure to keep or perform any of the covenants or conditions of the lease gave to the lessor the option to take immediate possession of the premises.

"The lessor in the lease reserved a lien upon any ore mined and upon all improvements for any unpaid balance of royalty, and it was also provided in the lease that the lessee should have the right to terminate the lease on any first day of January during its term by giving ninety days' notice of the purpose and desire so to do.

"The defendant, at the time it acquired this lease, paid to the prior lessee the sum of $612,000, in addition to contracting to pay the 30c. per ton royalty upon the ore mined, as has been stated.

"It is stipulated in the agreed statement of facts that the deposit of ore on the leased premises is of such character that its quality and quantity were capable of determination 'with extraordinary accuracy' by drilling and shafts, and that the defendant 'by drilling and by standard recognized methods' had calculated the tonnage remaining on the land on January 1, 1909, as 6,874,695 tons, all of which could be easily removed within the term of the lease."

Upon these facts the District Court reached the con-

clusion that the leases in question were not conveyances of ore in place, but were grants of the privilege of entering upon the premises and mining and removing the ore, and, consequently, that the deduction claimed as being one from capital investment could not be allowed. In reaching this conclusion the court cited the opinion of this court in *Stratton's Independence* v. *Howbert,* 231 U. S. 399, and the judgment of the Circuit Court of Appeals for the Eighth Circuit (211 Fed. Rep. 1023) affirming the judgment of the District Court (207 Fed. Rep. 419), which decision of the Circuit Court of Appeals was made after the return of the answer to the questions propounded by that court to this court in the *Stratton's Independence Case.*

Coming to the question as to what allowance should be made to the mining company by way of deduction from its income in making return the district judge said:

"The defendant paid $612,000 for the lease under consideration and in addition assumed the payment of the royalties stipulated for therein. This may properly and justly be considered a payment in advance of an increased royalty on ore to be mined, and that is precisely the character which the defendant gave to the payment when dealing with it in its private accounts, in which the stipulation shows, 'Ex. H,' that it carried one account, entitled 'Rate of general ledger or capitalized value .03885 per ton,' and another account entitled 'Rate of increment value, January 1, 1909, .44865 per ton.' These two values added make the 48¾c. per ton which the defendant deducted in making its return.

"Thus in its own bookkeeping the defendant gives its private opinion as to the requisite reimbursement necessary to maintain its capital investment, and thereby is made applicable that long-standing rule for the construction of contracts, viz., 'Show me what men have done under a contract and I will tell you what it means.' The defendant should not complain if it be held to that

construction of this lease and its investment under it which it adopted for purposes of its own accounting before the question of taxation had arisen to call forth ingenuity of interpretation.

"It results that a decree will be entered allowing instead of the deduction computed on the basis of 48.75 cents per ton of ore mined, the sum of .03885 cents per ton, and there being no question of bad faith in the case, the ends of justice will be served by the payment of interest at the rate of 6% per annum from the date when the additional payment found due should have been made."

The District Court thereupon entered judgment:

"And the court finds as conclusions of law from said facts that the defendant was entitled to deduct for and on account of the 544,353 tons of iron ore mined by it under its lease in the year 1910, the sum of .03885 cents per ton (which amount the parties agree hereby is the cost to defendant of said ore at the time it acquired the property in the year 1898, interest, taxes, surveys, and other carrying charges on the said ore up to the time of its removal from the said mine having been charged annually including the year 1910 into operating expenses), and defendant is not entitled to deduct the 48.75 cents per ton deducted by it in its return, and there is due from the defendant to the plaintiff the sum of $2,442.23, with interest thereon at 6% from the 30th day of June, 1911, the date when said sum should have been paid, and the court assesses the plaintiff's damages herein at $3,140.70, and judgment is hereby rendered against the defendant in favor of the plaintiff of the sum of $3,140.70, with interest from the first day of this term of court."

The company took the case to the Circuit Court of Appeals upon writ of error, that court reversed the judgment of the District Court, holding that the company was entitled to the deduction of 48.75 cents per ton upon each ton of ore mined, as so much depletion of capital assets.

(242 Fed. Rep. 9.) This conclusion was reached upon a construction of the lease in view of the character of the mining property involved, and largely because of the fact that the quantity of the ore in place could be estimated with substantial accuracy. The court held that the selling price of the ore in any one year so far as it represented the actual value to the mining company of the ore in the ground on January 1, 1909, was not income within the meaning of the Corporation Tax Act of 1909. In the course of its opinion the Circuit Court of Appeals announced the decisive question of law to be: "So far as the selling price of the ore in 1910 represented its actual value to the company in the ground on January 1, 1909, was it income or was it the sale price of capital assets?" And after dealing with the character of this lease and the property covered by it, said:

"We think that the lessee of such property and under such a lease is as much entitled as is the owner of the fee to treat the value of his interest in the ore in the ground at the beginning of the tax period as his capital—indeed, the lessee's right to do so, is, in some respects, the stronger of the two, as hereafter pointed out. Such a lease, as applied to this situation, is in every substantial way *pro tanto* a purchase."

This view of the character of these instruments and their legal effect differs from that taken by this court in the *Sargent Land Co. Case*, 242 U. S. 503, wherein precisely similar iron ore leases were under consideration. In that case this court reached the conclusion that such leases were not conveyances of the ore in place, but were grants of the privilege of entering upon, discovering, and developing and removing the minerals from the land, and that the lessor's income from such operations was obtained by a corporation shown to be carrying on business, and upon principles laid down in previous cases in this court (*Stratton's Independence* v. *Howbert, supra; Stanton*

v. *Baltic Mining Co.*, 240 U. S. 103) that such income was subject to taxation under the Corporation Tax Act of 1909.

In the *Sargent Land Co. Case* it was pointed out that the courts of Minnesota, certainly familiar with the physical characteristics of the ore deposits involved, had in a series of cases held these instruments to be leases, and that the royalties agreed to be paid were rentals in compensation for the privileges granted the lessee. We held the conclusion of the Minnesota courts to be war-ranted by reason and authority. (242 U. S. 503, and cases cited in margin, p. 518.)

The Circuit Court of Appeals distinguished the *Sargent Land Co. Case*, and of it said:

"Finally, it is urged that this case is controlled by the decision of the Supreme Court in the *Sargent Land Company Case*. The mining leases involved in that case and in this one seem to be identical in substance, and it is now said with great plausibility that the ore in the ground and affected by such a lease belongs partly to the lessor and partly to the lessee, and that if the interest of the lessor is not capital assets no more is the interest of the lessee, and that if the receipts of the former are income so must those of the latter be. We are convinced that the analogy between the two cases is superficial and not substantial. In that case the Supreme Court had to determine whether the royalties received by the lessor were income or were a depletion of capital. Many considerations led to the conclusion that they must be treated as income. The contract was a 'lease,' the receipts were 'royalties,' and royalties being rentals are inherently income and have been commonly so considered. All these things seem to have affected the conclusion of the court, but after all the dominating thought appears to be that when land is devoted to mining it is put to only one of those productive uses of which it is capable, and that the product of

the use should be called income.  The land itself is the
chief thing.  After the mining is finished the land remains
suitable for other uses; and the fact, if it is a fact, that the
minerals are the greater part of its value can not operate to
make the incidental overshadow the principal.  These rea-
sons do not apply at all to the case of the lessee, whose
existing interest, at the beginning of the taxing period,
over and above the royalty which he must pay, amounted
to $3,000,000; his entire interest was, each year, as far as
he went, consumed and exhausted forever; he did not have
remaining the principal thing, the land, which he could
put to some other use; the receipt in 1910 of his January
1st, 1909, interest in the ore was not the offshoot and in-
come of his property; it was the transformation and
eating up of the very property and of the whole of it.  We
therefore think that applying the principle of the *Sargent
Case* results in holding that these receipts were from the
sale of capital assets and not from income."

We are unable to concur in this view expressed in the
opinion of the Circuit Court of Appeals as to the effect of
the *Sargent Land Co. Case*.  Certainly this court had not
in mind the distinction suggested.  In the *Sargent Land
Co. Case* the Circuit Court of Appeals for the Eighth
Circuit found that the land including the ore in it was
worth hundreds of thousands of dollars, and without the
right to the ore the land was worth practically nothing.
(219 Fed. Rep. 38.)  This finding, as well as facts of gen-
eral knowledge, leaves little room to suppose that this
court made its decision concerning the rights of the lessor
influenced by the fact that the land itself was the chief
thing, and the ownership of it after the exhaustion of the
minerals one of the controlling reasons in reaching the
conclusion announced in that case.  The lessee takes from
the property the ore mined, paying for the privilege so
much per ton for each ton removed.  He has this right or
privilege under the form of lease here involved so long as

he sees fit to hold the same without exercising the privilege of cancellation therein contained. He is, as we held in the *Sargent Land Co. Case,* in no legal sense a purchaser of ore in place.

In this case the Government took no writ of error as to the partial deduction allowed by the District Court; it follows that the correctness of that ruling is not open here. The Circuit Court of Appeals erred in making the additional allowance for capital depletion. It follows that the judgment of the Circuit Court of Appeals must be reversed, and that of the District Court affirmed, and it is so ordered.

*Reversed.*

MR. JUSTICE CLARKE took no part in the consideration or decision of this case.